**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

KAREN FUERST,               :
                                    :
      Plaintiff,           :
                                      :
v.                             :     CIVIL ACTION FILE NO.
                                    :     _____
THE HOUSING AUTHORITY  :
OF THE CITY OF ATLANTA,  :
GEORGIA,               :
                                      :
      Defendant.         :

## COMPLAINT

Plaintiff Karen Fuerst hereby files her Complaint against Defendant The Housing Authority of the City of Atlanta, Georgia for whistleblower retaliation under the National Defense Authorization Act, 41 U.S.C. § 4712 (the "**NDAA**"). In support of her claim, Fuerst alleges, on information and belief, as follows:

## NATURE OF THE ACTION

1.

The Housing Authority of the City of Atlanta, Georgia ("**AHA**") hired Fuerst for the office of the General Counsel in October 2010.[1] During her tenure of

---

[1] AHA is a state-created authority that is not a part of the City of Atlanta and is not funded by the City. The United States Department of Housing and Urban Development ("**HUD**") provides the majority of AHA's funding.

nearly seven years, she consistently received the highest rating on her employee reviews and was promoted several times, serving most recently as Senior Vice President and Deputy General Counsel for Real Estate.

2.

In addition to her job duty as AHA's lead real estate attorney, Fuerst was tapped to serve on AHA's Investment Committee, an upper-level management body that shapes and approves AHA policies and approves—and authorizes submittal to AHA's Board of Commissioners for approval of—policy changes and major expenditures of AHA's public funding.

3.

In late 2016, at a meeting of the Investment Committee, Fuerst protested

█████████████████████████████████████ 2 ████████████████████████████████████

---

[2] Buell was hired as COO of AHA in January 2016 and was announced in late September 2016 as the "incoming President and CEO" as of January 1, 2017. For all intents and purposes, Buell acted as CEO toward the end of 2016, although she was technically the COO through December 31, 2016. *See* Saporta Report, Maria Saporta (Sept. 30, 2016), https://saportareport.com/joy-fitzgerald-retiring-ahas-ceo-catherine-buell-succeed-jan-1/. There was no COO when Buell was hired; the position was created for her. Buell's relationship with former Mayor Kasim Reed goes back many years. On or around the time she attended Spelman College (from which she graduated in 2001), according to a prior résumé, she worked as an intern with Reed when he served in the Georgia House of Representatives. As reported in The Saporta Report, AHA's January 27, 2016 press release announcing Buell's hiring significantly misrepresented Buell's real estate development-related



4.

---

experience. The information in the release stated, "Buell led the District of Columbia's $2.5 billion transformation of the 183-acre St. Elizabeths East campus into a 5-million-square-foot development that features an Innovation Hub." *See* Saporta Report, David Pendered (Jan. 27, 2016), https://saportareport.com/aha-appoints-executive-to-oversee-agency-help-guide-30-choice-neighborhoods-grant/. To the contrary, no such transformation of St. Elizabeths East had occurred under Buell, although there was a concept plan for an innovation hub towards the end of Buell's tenure. Buell's development accomplishments were limited to overseeing development of the Gateway DC Pavilion, an outdoor, covered event space including a 3,100 square foot conference center, and the renovation of the original St. Elizabeths hospital chapel into the R.I.S.E. Demonstration Center, a 2,650 square foot meeting/event center.

████████████████████████████████████

███████████████████████████████

███████████████████████████

███████████████████████████

████████████████████████████████

████████████████████████████████

████████████████

5.

When Fuerst confronted Buell about ██████████████████████

███████ Buell became agitated and pushed back against Fuerst's disclosures to the

point of yelling at Fuerst in front of the Investment Committee and other meeting

attendees.

6.

Each of these proposed actions, which despite Fuerst's admonishments, were

carried out ████████████████████████████

████████████████████████████████

█████████████████████████████

█████████████████████████████████

██████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████████[3]

7.

Moreover, those actions at Buell's direction were contrary to the terms of the public-private partnerships entered into between AHA and Integral under their development agreements, which provide for those parties to work *together* to redevelop the sites of former public housing communities with a mix of public housing, market rate housing, and community-appropriate commercial (non-housing) development, all consistent with the mandates of the grants awarded by the United States Department of Housing and Urban Development ("**HUD**") that funded and provide ongoing subsidy to a portion of the developments.

8.

Finally, those actions at Buell's direction were contrary to the directive of Georgia's Housing Authorities Law, which expressly "authorize[s] every authority to do any and all things necessary or desirable to secure the financial aid or

---

[3] As set forth in Section 1.2 of its Bylaws, "The mission of [AHA] is to provide quality, affordable housing in amenity rich, mixed-income communities for the betterment of the community."

cooperation of the federal government" in connection with the development and operation of housing projects, including mixed-income developments. O.C.G.A. § 8-3-32.

9.

Fuerst strongly protested the unwarranted and precipitous nature of these actions and warned ███████████████████████████████████ ████████████████████████████████████ ███████ ███████████████████████████████████ ████████████████████████████████. Specifically, Fuerst warned during an Investment Committee meeting ███████████████████████ ██████████████████████████████████ ████████████████████████████████████ █████████████████████████████████████████ ████████

10.

---

[4] In addition to her deep legal knowledge about mixed-income housing developments, Fuerst has decades of knowledge about the business of housing development and finance, and was frequently called upon to guide and train her colleagues in these areas, in addition to providing legal counsel.

Buell appeared to have an agenda contrary to AHA's mission, and deliberately avoided seeking counsel from Fuerst about the LIHTC and affordable housing development processes[5], despite Fuerst's depth of experience in these areas. Buell's deliberate avoidance of Fuerst later became more insidious: Buell hid matters from Fuerst that evidenced that the dire consequences that Fuerst warned of in the Investment Committee meetings were in fact looming on the horizon.

11.

After the Investment Committee meeting at which Fuerst warned



---

[5] Buell's experience with affordable housing in general, and the affordable housing development process in particular, prior to her arrival at AHA is undocumented and unknown. *See generally*, Saporta Report, Maria Saporta (Sept. 30, 2016), https://saportareport.com/joy-fitzgerald-retiring-ahas-ceo-catherine-buell-succeed-jan-1/.

████████████████████████████████████████

██████████████████████████████████████████████

███████████

12.

Likewise, Fuerst also warned Buell and other members of the Management

Committee that ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████[6]

The vast majority, if not all, of AHA's affordable housing developments include

LIHTC funding as a capital source. Without that funding, the developments cannot

happen. Those affordable housing developments are of key importance to AHA's

as a public housing authority created under Georgia's Housing Authorities Law.

Moreover, the production, maintenance, and operation of mixed-income housing

by public-private partnerships created under AHA's development agreements with

---

[6] Because AHA was a "co-developer" applicant with Integral on some LIHTC
applications, if Integral lost LIHTCs because it failed to comply with the terms of
the LIHTC program (including dates for financial closings and completion of
housing developments), both AHA and Integral would potentially be penalized
under later LIHTC application rounds. In fact, this occurred, and affected AHA
housing developments with other developers besides Integral, as reflected in
documents Fuerst received from an Open Records Act request to DCA, as well as
by the various affordable housing development closing delays noted in AHA's
Fiscal Year 2018 Annual MTW Report.

its private developer partners, including Integral, is a key requirement of the HUD grant agreements under which AHA receives its federal funding.

13.

In addition to the risk of LIHTC requirements and HUD grant agreements being violated, some of the ongoing, arbitrarily and serially delayed approvals by AHA of Integral closings threatened AHA's ability to comply with a $30 million grant agreement among AHA as grantee, the City of Atlanta as co-applicant, and HUD as grantor. HUD awarded the grant to AHA in 2015 to cover part of the costs for the continued revitalization of AHA's former University Homes public housing community and the surrounding Atlanta neighborhoods (the "**Choice Neighborhoods Grant**").

14.

The Choice Neighborhoods Grant Agreement mandated that the financing for the first development project funded with the grant, known as Ashley Scholars Landing I, be closed on or around March 28, 2017.[7] It was clear over the course of

---

[7] AHA reported in its Fiscal Year 2017 Annual MTW Report that although the March 28, 2017 development phase closing date under the Choice Neighborhoods Grant Agreement was not met, AHA had received HUD approval to close by September 14, 2017. In March 2018, AHA's website posted a photo showing Buell and other AHA employees with shovels in hand, supposedly at a groundbreaking ceremony for the delayed phase, yet groundbreakings do not occur without a financial closing. Despite the March 2018 posted photograph to the contrary,

several Investment Committee meetings that this contractual milestone likely

would not be met, given Buell's acts to disavow the terms of Integral's

development agreement for University Homes and intentionally delay submission

to the AHA board of the resolutions that needed to be approved for achievement of

the financial closing milestone. Fuerst protested ████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██ $30 million grant itself.[8]

15.

_____

neither the financial closing nor actual groundbreaking had occurred as of the
September 28, 2018 date of AHA's FY 2018 Annual MTW Report. In fact, the
actual groundbreaking finally occurred on November 2, 2018 and was attended by
AHA representatives and board members as well as Atlanta's mayor and
representatives from HUD, DCA, and Integral. It was not until the FY 2019
Annual MTW Report, dated September 25, 2019, that AHA reported that the
financial closing had occurred, and construction was under way. The MTW reports
are available on AHA's website, at https://www.atlantahousing.org/about-us/plans-
reports/.
[8] In fact, in early 2018, HUD advised new Mayor Keisha Lance Bottoms that "If
the city did not take drastic moves to fix the Atlanta Housing Authority and bridge
the divide with Integral and [its CEO, Egbert] Perry, Atlanta likely would lose the
$30 million Choice Action [sic] grant that had been awarded by HUD in 2015."
Saporta Report, Maria Saporta (Nov. 5, 2018), https://saportareport.com/an-
analysis-scholars-landing-helps-save-atlantas-choice-30-million-grant.

Beginning around the date of the late 2016 AHA Investment Committee

meetings when Fuerst protested ██████████████████████████████████

████████████████████████████████████████ Buell (1)

shut Fuerst out of AHA's communications and negotiations with Integral and (2)

walled off Fuerst from ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████[9] (b) important, internal AHA changes in position (in

---

[9] Fuerst's colleagues working on these matters advised her that they could not talk with her about the work they were doing, so Fuerst did not know what they were working on. On a number of occasions, however, when Fuerst stepped into Vranicar's office to speak with him, she noticed him poring over binders of contracts and related documents from closed Integral transactions. On information and belief, this "work" consisted of hundreds of hours of work by AHA employees gathering and mining data from AHA's agreements with Integral, which was later presented by AHA to the press with significant, deliberate omissions and intentionally misleading statements in order to fuel a public campaign, funded with taxpayer dollars, to distort and sensationalize the terms of 2011 amendments to some of the Integral agreements and suggest that those amendments were made in an improper and illegal manner. *See* footnote 11, *infra*. On information and belief, this data gathering and ensuing smear campaign set the groundwork for (i) a lawsuit brought by AHA against Integral and its affiliates in September 2017 after Fuerst's departure and (ii) in the waning days of former Mayor Kasim Reed's administration, in December 2017, a RICO lawsuit brought by the City of Atlanta against Egbert Perry (Integral's CEO) and Renee Glover (AHA's former CEO, who had been pushed out by former Mayor Kasim Reed via actions by the AHA Board of Commissioners appointed by Reed, led by then-Board Chair Daniel Halpern). *See The Housing Authority of the City of Atlanta, Georgia v. Integral Development, LLC, Grady Redevelopment, LLC, Capitol Gateway, LLC, Harris*

contravention of the terms of existing agreements) affecting the funding and

progress of ongoing work on affordable housing projects by Integral affiliates and

other AHA development partners (which projects had previously been approved by

AHA's Board of Commissioners) under their respective development agreements

with AHA, and (c) AHA's communications with HUD ███████████████

████████████████████████████████████████████████ (even

though Fuerst had a productive working relationship with and had been serving as

AHA's lead legal liaison with HUD at its highest levels under Joy Fitzgerald,

AHA's prior CEO).

16.

At times, Fuerst was unable to obtain support from legal staff supervised by

her to assist with Fuerst's work on affordable housing development matters

---

*Redevelopment, LLC, Carver Redevelopment, LLC,* Civil Action No.
2017CV294880, Superior Court of Fulton County, Georgia (the "**AHA Suit**"),
available at https://khlawfirm.sharefile.com/AHAandRICOsuits; *City of Atlanta,
Georgia v. Egbert L.J. Perry, Renee L. Glover, Integral Development, LLC, Grady
Redevelopment, LLC, Capitol Gateway, LLC, Harris Redevelopment, LLC, Carver
Redevelopment, LLC*, Civil Action No. 2017CV298975, Superior Court of Fulton
County, Georgia (the "**RICO Suit**"), also available at
https://khlawfirm.sharefile.com/AHAandRICOsuits. The RICO suit was dismissed
by the City early in Mayor Keisha Lance Bottoms' term, shortly after the HUD
meeting with the Mayor (*see* Footnote 8 above) in which HUD threatened to pull
the $30,000,000 Choice Neighborhoods Grant. AHA received adverse rulings in
the AHA Suit, with the judge dismissing all of AHA's claims. The AHA Suit,
Order on Pending Motions (April 30, 2018).

involving developers other than Integral; instead, Fuerst was informed by her direct reports that "I'm working on something for Catherine [Buell] now and I've been told it takes precedence."

17.

As further retaliatory action against Fuerst, Buell, without telling Fuerst, had AHA engage an outside legal recruiter to identify candidates for a new, management level, in-house real estate attorney for AHA. There had been no request from Fuerst to hire another real estate attorney; in fact, Fuerst had accomplished significant cost savings to AHA by training existing real estate attorneys and a paralegal to better serve AHA's real estate legal needs. Under Fuerst's leadership, outside legal spend on real estate matters was cut dramatically, saving AHA hundreds of thousands of dollars annually beginning in 2011.

18.

Although Vranicar was aware of this hiring initiative, he did not inform Fuerst, who learned of it after on-line advertisements for the position were posted and discovered by Fuerst and other attorneys at AHA. Vranicar told Fuerst in response to her questions about the reason for the hire that he did not think it was to replace Fuerst. Fuerst later sought assurances from Buell in Vranicar's presence as to whether Fuerst's job was at risk, and Buell assured Fuerst it was not.

19.

In that meeting, Fuerst protested that contrary to AHA policy, the new attorney position had not been posted internally by AHA; this policy had routinely been adhered to previously, insofar as Fuerst was aware. Fuerst advised both Vranicar and Buell that Lisa Washington, Fuerst's senior-most report, was well qualified for the advertised position and deserved the promotion given her excellent work and strong development under Fuerst. Buell and Vranicar rejected Fuerst's suggestion, and failed to address the fact that the position was not posted internally.

20.

Fuerst, Vranicar, and Mark Kemp, AHA's then COO, were directed by Buell to interview several real estate counsel candidates who the recruiting firm steered to AHA. The most qualified and suitable candidate identified by those interviews (who did not have anywhere near Washington's experience) was later interviewed by Buell, after which Vranicar advised Fuerst that the candidate did poorly in speaking with Buell and would not be hired.

21.

Approximately three more times in the following months, including in late February 2017, Fuerst protested ███████████████████████████

██████████████████████████████████████████████

████████████████████████████████ Vranicar was a member of

the Investment Committee beginning in late 2016, so he was aware of Fuerst's

protests regarding ████████████████████████████████████████

████████████████████████████.

22.

In addition, Fuerst protested in person to Vranicar about ██████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

██████████████

23.

Likewise, the resolution was presented and passed by the Board without

notice to Vona Cox, an AHA Vice President and head of its contracting and

procurement division. Normally, a policy affecting procurement matters would not

only have been fully vetted with and endorsed by Cox; it would also have been

presented by her, first to the Investment Committee, and after approval by that

body, to the Board.[10]

24.



Fuerst expressed concern to Vranicar about

and protested that

25.

Finally, Fuerst also spoke with Vranicar on more than one occasion about

the fact that she, alone, was being walled off by Buell and Vranicar from what was

clearly an expansive investigation into the 2011 amendments to AHA's

revitalization agreements with Integral. Although Fuerst was AHA's lead real

estate attorney working on the amendments, Lisa Washington, another member of

AHA's Office of General Counsel, worked with Fuerst on the amendments.

---

[10] Cox was later pushed out by Buell and Kemp, leaving AHA without a chief procurement officer for several months while important procurements were undertaken. For a period of time, Buell was identified as AHA's chief procurement officer.

16

Washington had also been involved in negotiations with Integral concerning the further leverage amendments prior to Fuerst's being hired at AHA, so she was very familiar with the contracts and their negotiation history. Yet only Fuerst was walled off from Integral matters and the investigations into the 2011 amendments. When Fuerst asked Vranicar why she was walled off, Vranicar told Fuerst he didn't know why, adding that he had told Buell she should talk with Fuerst. Fuerst was made to feel like a criminal.

26.

On more than one occasion, Fuerst also shared her concerns in detail with AHA's Director of Human Resources (the "**HR Director**"), as described in more detail below.

27.

On or about the week of February 20, 2017, approximately twenty of AHA's leaders, including Fuerst, Buell, Mike Proctor (who played a key role in AHA's Investment Committee), the HR Director, Trish O'Connell, and Cecilia Taylor attended an extended senior leadership team meeting run by Buell. At that meeting, Buell took up the issue of AHA's development agreements with Integral, in particular, the 2011 amendments to those agreements. Fuerst had been the lead AHA attorney involved in the negotiation and drafting of those amendments.

28.

When the 2011 amendments were completed, the HUD-mandated, mixed-income housing phases of the HUD-approved revitalization plans for the former AHA housing communities covered by the development agreements had been completed, the HUD revitalization grants funding a portion of those developments had been fully expended towards achievement of that milestone, and the HUD mandated "replacement" public housing units were occupied by low-income residents.

29.

In short, all public funds allocated towards the revitalization of the former public housing communities—mostly HUD funding granted to AHA—had been spent on prior phases of the revitalization, and the remaining phases as contemplated by the HUD-approved revitalization plans for the communities would be funded with private funds, "leveraged in" to the development by the developer. That ability to leverage was made possible by the successful, mixed-income, mixed-finance phases of the revitalization that had been developed to date under the revitalization agreements. The "further leverage" amendments set forth the terms on which both Integral and AHA, as partners in the public-private

partnership, would share in the profits from the further leverage development phases.

30.

With the input and approval of AHA's then Director of Real Estate, Joy Fitzgerald, the 2011 amendments addressed the remaining market rate components of the revitalization plans for the communities, with provisions modeled on those included in the University Homes revitalization agreement, with which Fitzgerald had also been involved.

31.

Under the 2011 amendments, consistent with the terms of the HUD grant agreements and the HUD-approved revitalization plans, private funds sourced by Integral would finance the "further leverage," market rate development components, and Fuerst negotiated for AHA to participate in a favorable share of the profits from such prospective development. In fact, under the 2011 amendments, AHA ended up in a substantially better economic position than it had been in when negotiations of those terms previously led by Fitzgerald, with assistance from outside AHA counsel, had broken off prior to Fuerst's arrival at AHA.

32.

At the extended senior leadership team meeting, Buell abruptly announced that on Friday of that week, February 24, 2017, the Atlanta Journal Constitution would be running an article about Integral's development agreements with AHA.[11] Taylor, who was hired by Buell to handle media outreach and other public relations matters (even though AHA already had contracted with and continued to use an outside public relations firm), then described the 2011 amendments to the Integral development agreements in terms that were misleading, inflammatory, and so shocking that the HR Director gasped audibly in response. Fuerst promptly made statements ██████████████████████████████████████████ ████████ Others in the meeting, including Trish O'Connell, responded in

---

[11] Publication of the article was delayed until March 10, 2017, the last day of Fuerst's employment at AHA. *See* Atlanta Journal Constitution, Willoughby Mariano, https://www.ajc.com/news/local/how-atlanta-housing-agency-for-the-poor-might-help-the-well-off-instead/X83FzIKPaZrShAPVz2FP6O/. However, the AHA-fueled public relations campaign promoting this false narrative would continue through 2017 and beyond. *See, e.g.*, AHA press release of September 14, 2017, "AHA FILES LAWSUIT TO PRESERVE 100 ACRES FOR AFFORDABLE HOUSING; Legal action intends to prevent developer from pursuing massive profits and building luxury housing on land intended for low-income residents," https://www.atlantahousing.org/wp-content/uploads/2018/03/press-release-legal-suit.pdf; and accompanying map and related matters previously posted as a webpage on AHA's website, https://www.atlantahousing.org/wp-content/uploads/2018/03/Atlanta-Map-9.13.pdf.

acknowledgement of Fuerst's remarks. Buell was silent in response to the comments.

33.

On the afternoon of Friday, February 24, 2017, Chief Operating Officer Kemp and the HR Director came into Fuerst's office with no warning. They told her that "as she knew" there was an ongoing inquiry into the 2011 amendments to the Integral agreements,[12] and that it was being recommended that Fuerst be investigated regarding those matters. Accordingly, they continued, Fuerst was being placed on administrative leave for purposes of an "investigation" into Fuerst's role with respect to the 2011 Integral development agreement amendments.

34.

---

[12] Baker Donelson, under supervision of attorney Joe Whitley, was conducting an ongoing investigation into these 2011 amendments. Fuerst was not privy to the objectives or parameters of this investigation, nor was she aware of its existence until Kemp and Buell brought Whitley and some of his colleagues into a conference room (where Fuerst had been called to meet with Buell) and introduced them to Fuerst, informing Fuerst that Baker Donelson would be looking into the amendments. Other law firms had previously been engaged at the direction of the Board or the CEO to look into the 2011 amendments. Fuerst spoke to the Baker Donelson attorneys twice, at length, but was very concerned when they did not seem to appreciate the distinction between the mixed-income housing components of the developments and the market rate components of the developments.

Kemp and the HR Director refused to tell Fuerst why she was being investigated. Kemp told Fuerst that after the investigation, "We will see where things are; maybe you will come back, maybe you won't." He then left the meeting while the HR Director remained in Fuerst's office, telling Fuerst to take her time packing up her things.

35.

Fuerst printed out the Whistleblower and Non-Retaliation section of AHA's employee handbook and reviewed that provision in person with the HR Director before she left her office. Fuerst told the HR Director that she was a whistleblower, and that although she had not yet disclosed any of her concerns outside of AHA, she reminded the HR Director of recent disclosures she had made to him.

36.

Specifically, Fuerst had told the HR Director (who did not participate in Investment Committee meetings) previously about the Investment Committee meeting in which ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

37.

Likewise, she had told the HR Director about similar instances of

Investment Committee meetings in which ████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

38.

Fuerst also recounted to the HR Director how she had been walled off from

working on matters that she routinely handled in her position as Senior Vice

President and Deputy General Counsel, and that Fuerst was only learning of some

matters by virtue of her role as a member of the Investment Committee, and not

because her legal counsel was sought.

39.

The HR Director was also well aware of the toll that this and other

retaliatory actions had taken on Fuerst, as Fuerst had been communicating with

him since early in January, seeking a reasonable accommodation under the

Americans with Disabilities Act to lessen symptoms of the stress that Fuerst was experiencing.

40.

Further, prompted by learning of the Baker Donelson investigation into the 2011 Integral development agreement amendments as well as the fact that Fuerst had been walled off from Integral matters, Fuerst had previously spoken to the HR Director of her grave concerns about ███████████████████████████

████████████████████████████████████████

███. In fact, as Fuerst told the HR Director, ███████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

███████████████████████████████████

████████████████████████████████

███████████████████████████████

41.

In that same conversation with the HR Director, Fuerst told him about ████

████████████████████████████████████



42.

Further, Fuerst recounted to the HR Director that ███████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████ Fuerst shared her concern

with the HR Director that it appeared that ███████████████████

████████████████████████████████████

████████████████████████████████

███████████

43.

Despite requirements under the Whistleblower and Non-Retaliation section of AHA's employee handbook as well as under the NDAA that AHA promptly investigate reports of retaliation and keep Fuerst as the reporting individual informed as to the status of the investigation,  AHA did not investigate Fuerst's whistleblower claims, did nothing to inform her of the status or findings of the Baker Donelson investigation or any other investigation, and instead terminated her on March 9, 2017 (effective March 10, 2017), citing a "loss of confidence in [Fuerst's] ability to provide legal counsel in matters pertaining to real estate."

44.

This pretextual explanation for her termination flies in the face of every review Fuerst received (all of which were laudatory) as well as the HR Director's follow up communication with Georgia Department of Labor ("**GDOL**") on Fuerst's unemployment claim, when GDOL required verification that Fuerst was not terminated for cause based on the language in her termination letter. GDOL

promptly processed Fuerst's unemployment payments after hearing from the HR Director.

45.

Later, after having left AHA's employ, the former HR Director confirmed to Fuerst that AHA never investigated her whistleblower allegations.

46.

Fuerst now seeks damages for this retaliatory discharge and the other adverse acts leadings up to it as well as the consequences of these acts as a protected whistleblower under the National Defense Authorization Act, which affords protection for whistleblowers who have disclosed information that they reasonably believe is evidence of an abuse of authority related to a federal contract or grant or gross mismanagement of a federal contract or grant.

Buell's and AHA's actions about which Fuerst protested were both.

## **THE PARTIES**

47.

Plaintiff Karen Fuerst is a private citizen and resident of Fulton County, Georgia.

48.

Defendant The Housing Authority of the City of Atlanta, Georgia—commonly referred to as the Atlanta Housing Authority or Atlanta Housing ("**AHA**")—is a body corporate and politic organized under the Housing Authorities Law of the State of Georgia, and can be served with process through Lisa Washington, its interim General Counsel, located at 230 John Wesley Dobbs Avenue, Atlanta, Georgia 30303.

## JURISDICTION AND VENUE

49.

The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331 and 41 U.S.C. § 4712, and venue is proper under 28 U.S.C. § 1391.

## OPERATIVE FACTS

### *Description of AHA*

50.

AHA is the largest housing authority in Georgia and one of the largest in the nation. AHA provides and facilitates affordable housing resources for nearly 22,000 low-income households comprised of approximately 50,000 people.

51.

The mayor of Atlanta appoints the members of AHA's Board of Commissioners in accordance with Georgia's Housing Authorities Law. All but

two of the current AHA Board members were appointed by former Mayor Kasim Reed.

52.

Consistent with Georgia's Housing Authorities Law and governing HUD laws and regulations, AHA's Bylaws provide that the powers of AHA shall be vested in its Board of Commissioners, ". . . which shall be the sole governing and policy-making body of the Authority. The day-to-day management and operational functions of the Authority shall be delegated by the Board of Commissioners to the President and Chief Executive Officer who has the responsibility to hire and manage a staff of professional and other personnel . . . ." AHA Bylaws, Section 1.1(e) (adopted January 30, 2019). "The President and Chief Executive Officer [ . . . ] shall serve at the pleasure of the Board of Commissioners, subject to any applicable agreement[, and ] shall be responsible for the daily management, administration and operations of the Authority as provided by and in accordance with the applicable laws and regulations of the United States Department of Housing and Urban Development, as modified by the MTW Agreement, and the State of Georgia. The President and Chief Executive Officer shall be responsible for implementing the policies of the Authority as adopted by the Board of Commissioners." *Id.* Section 3.1.

53.

The City of Atlanta does not fund AHA or its activities and AHA is not a component part of the City of Atlanta. Nonetheless, Buell, beginning while she was AHA's COO and continuing while she later became President and CEO, routinely attended weekly meetings of the Mayor's cabinet under former Mayor Kasim Reed.

54.

HUD provides the majority of AHA's funding and regulates AHA's programs.

55.

AHA enters into contracts with HUD and is a HUD grant recipient. Grant monies received by AHA from HUD are federal funds, which constitute the vast majority of funding available to AHA. Accordingly, federal law and regulations govern the expenditure of AHA's HUD funding.

56.

AHA's affordable housing resources include AHA-owned residential communities, AHA-sponsored mixed-income, mixed-finance residential

communities, Housing Choice vouchers, supportive housing arrangements, and homeownership opportunities.

57.

AHA's mission, as stated in Section 1.2 of its Bylaws, is "to provide quality, affordable housing in amenity rich, mixed-income communities for the betterment of the community." A "mixed-income" community is developed to market standards, including market amenities, and must reserve percentages of its units for rental to residents of various income levels, so that housing in the community is affordable to a broad economic spectrum of residents.

58.

Typically, in a mixed-income apartment community, 20% of the apartments are reserved for moderate income residents, whose income levels qualify them to reside in LIHTC rent-restricted units with moderate (as opposed to market rate) rents, and who do not receive additional AHA-funded rent subsidy, 40% of the apartment units are reserved for residents paying market rate rents, and the remaining 40% of the units are "public housing-assisted" (or "**PHA**") units, reserved for low-income residents whose rental payments are subsidized with HUD funds granted to AHA and in turn, paid by AHA to the owner of the housing

community in order to bring the total rent received for the PHA units up to the moderate rent levels charged for the LIHTC units.

59.

In effectuating its mission, Georgia's Housing Authorities Law empowers housing authorities like AHA to accept federal grants in support of housing projects and "authorize[s] every authority to do any and all things necessary or desirable to secure the financial aid or cooperation of the federal government in the undertaking, construction, maintenance, or operation of any housing project by such authority." O.C.G.A. § 8-3-32.

60.

The mixed-income community concept arose in HUD housing development statutory grant programs such as HOPE VI and Choice Neighborhoods, which recognize that the historical practice of concentrating low income housing within communities (i.e., the "old" public housing model) presented insurmountable problems for its residents and the surrounding neighborhoods. Accordingly, those HUD grant programs mandate that affordable housing must be developed in mixed-income communities in which low income housing is deconcentrated, and the development agreements between AHA and its private sector development

partners reflect that requirement consistent with the HUD grants funding mixed-income housing projects under those agreements.

### *Fuerst's Role with AHA*

61.

AHA hired Fuerst for its Office of General Counsel in October 2010.

62.

Prior to joining AHA, Fuerst had been a partner at Arnall Golden & Gregory (now Arnall Golden Gregory LLP) in Atlanta and later served for over a decade as in-house counsel for the southern division of The Trust for Public Land, a San Francisco-based non-profit land conservation organization, in its Atlanta office.

63.

During her tenure of nearly seven years at AHA, Fuerst consistently received the highest rating on her employee reviews and was promoted several times.

64.

In her most recent role as Senior Vice President and Deputy General Counsel for Real Estate at AHA, Fuerst was AHA's lead real estate counsel and its lead legal liaison with HUD.

65.

Fuerst also served on AHA's Investment Committee, an upper level management body that shapes and approves AHA policies and approves (and authorizes submittal to AHA's Board of Commissioners for approval of) policy changes and major expenditures of AHA's public funding.

66.

Fuerst supervised and mentored as many as five direct reports.

67.

Fuerst supervised and managed outside legal counsel.

68.

Fuerst collaborated with business leads and key staff to ensure careful consideration of legal, business, and risk management issues.

69.

Fuerst negotiated and drafted partnership and transactional documents for public-private development of mixed-income, mixed-finance housing projects (including single and multifamily housing) and mixed-use (i.e., including housing, commercial, and/or community-serving retail) developments.

70.

Fuerst, together with others, also drafted Requests for Qualifications and Requests for Proposals and served on review teams for the procurement of

developers and multifamily owners seeking HUD-funded subsidies for affordable rental units.

*AHA's Revitalization Agreements with Integral*

71.

In 2011, AHA and Integral entered into the University Homes Revitalization Agreement. Under HUD and AHA nomenclature, a "revitalization agreement" is the term used for the real estate development agreements between AHA and its private sector development partners.

72.

Revitalization agreements govern the process, procedures, and business terms for the public-private partnership between AHA and its development partner that is intended to result in the complete "revitalization" of the site of a former public housing project by developing replacement housing for some of the former residents in a new, mixed-use, mixed-income community. Once the replacement housing has been completed, property values are enhanced which helps to attract private investment and further neighborhood-wide redevelopment efforts.

73.

AHA's private development partners perform all real estate development activities, guaranty financing as required in the market, and operate the new,

mixed-income housing communities per the terms of the revitalization and related agreements, and subject to HUD and Internal Revenue Service ("**IRS**") (due to the use of LIHTCs as part of the project funding) requirements.

74.

The developments are "owned" by single-purpose entities affiliated with the developer (and in which AHA or its affiliate typically owns a minority interest) and are built on land owned by AHA and leased long-term to the owner entities. At the end of the ground lease term, the land and the housing development become wholly owned by AHA, without AHA being required to pay for the apartments built on AHA's land. Pursuant to the terms of the revitalization agreements and other, related contracts, AHA and/or its affiliates receive(s) various fees from the developer and/or the owner entity. Also, AHA provides a subordinated loan to the owner entity, which covers a portion of the cost of developing those units in each mixed-income housing development that are reserved for occupancy by low-income residents, whose lease payments are subsidized with HUD grant funds from AHA.

75.

The subordinate loans from AHA are funded with HUD grant funds. Those funds are loaned into the developments, rather than granted outright, in order to

maximize the amount of LIHTC equity that can be raised to fund the development in accordance with IRS rules governing LIHTCs. Maximizing LIHTCs is critical, because without the equity contributed towards project costs by the LIHTC investor, low-income housing developments are typically not financially feasible.

### AHA's Further Leverage Amendments with Integral

76.

AHA and Integral also finalized further leverage development amendments to various existing revitalization agreements in 2011 (the "**Further Leverage Amendments**").

77.

The Further Leverage Amendments occurred in 2011 because the underlying Hope VI grants for the various communities were being closed out between AHA and HUD per the terms of the HUD grant agreements.

78.

Grant closeout was required under the terms of the HUD grant agreements with AHA because the "HUD-required components" of the revitalization plans (i.e., the mixed-income and low-income housing phases, including units reserved for rental to low-income households), which were funded in part with HUD grant funds, had been completed. All that was left to do at those communities was the

(non-HUD funded) "further leverage" developments; no additional low-income rental housing units were required or contemplated. This is because, in keeping with the mixed-income construct of the HOPE VI and Choice Neighborhoods HUD grant programs, the percentage of low-income, HUD-subsidized housing in the revitalized communities is not to exceed a level approved by HUD (as reflected in the HUD-approved revitalization plan). The term "further leverage" is utilized because these developments require that AHA's private developer partner "leverage in," or raise, private funding to cover the development costs.

79.

The rights to develop the further leverage properties—the undeveloped land parcels now located near already completed development phases that include replacement housing—were granted to Integral in the original revitalization agreements (which were entered into in the late 1990s or early 2000s, soon after Integral was procured as a developer by AHA).

80.

The terms of the further leverage developments set forth in the original revitalization agreements, however, were either described in bare-bones fashion or stated as "to be negotiated." This is because at the time the revitalization agreements (other than for University Homes) were entered into, neither AHA nor

Integral could reasonably conceive of what sort of development might become feasible in the future on the further leverage properties. Also, the Further Leverage Amendments imposed a time limit on when Integral must exercise (or lose) its development rights, so that the further leverage properties could not be tied up by the developer partner long-term, without any development occurring.

### *The Significance of LIHTCs in Funding Affordable Housing Projects*

81.

LIHTCs are created under and governed by the Internal Revenue Code and IRS regulations issued pursuant thereto.

82.

The Georgia Department of Community Affairs ("**DCA**") has awarded Integral LIHTCs via a rigorous, competitive process that considers, among other factors, the applicant-developer's track record on other LIHTC-funded projects.

83.

If a developer or co-developer fails to develop an LIHTC-funded project within the time frames mandated under the governing Internal Revenue Code regulations, including achieving the milestones for financial closing at the start of

construction, and the placed in service date for the completed rental units, it can be barred for a period from applying for or being awarded additional LIHTCs. [13]

84.

LIHTC equity typically covers a significant portion of the cost of producing low-income housing, with the balance of the cost typically covered by (i) first priority, conventional bank financing insured by HUD, and (ii) "soft,"  housing authorities' loans (consisting of HUD grant funds), which are subordinated to the first priority, conventional financing.

85.

Soft loans made by housing authorities are only repaid if the project produces enough cash flow to fully pay the conventional bank loan and other "above-the-line" costs. This is consistent with the fact that such loans are funded with HUD grant funds, and are "loaned" into the project rather than granted outright in order to maximize the amount of LIHTC equity that can be raised.

86.

LIHTC funding is paid into the projects by the LIHTC "investors" (i.e., high income taxpayers in need of credits against future income tax liabilities) as equity;

---

[13] AHA is often included in the LIHTC application as a co-developer, which allows it to receive a portion of the developer's fee in accordance with a fee-split arrangement with its private developer partner.

*it is not debt*, and unless the project fails to follow LIHTC statutory requirements, there is no requirement that the investors' LIHTC equity be repaid.

87.

AHA's private sector development partners such as Integral bear the full risk of ensuring compliance with LIHTC rules, and they guarantee repayment of the investor LIHTC equity and other LIHTC costs in the event of the project's failure to fully comply with LIHTC rules. This is a substantial economic risk, borne entirely by AHA's private sector development partners in its public/private affordable housing development partnerships.

### *Fuerst Engages in Protected Activity by Protesting Buell's and AHA's Actions Delaying Financial Closings for Mixed-Income Housing at the November/December 2016 Investment Committee Meetings*

88.

In or around November and/or December 2016, AHA's Investment Committee met several times. Fuerst, Buell, Chief Policy Officer Mike Proctor, and other members of the Investment Committee were present.

89.

At various November/December 2016 Investment Committee meeting(s), the Investment Committee was asked to approve the business terms for various upcoming financial closings involving Integral, including the closing for the

rehabilitation of the Centennial Place Phase III development. Those financial

closings included LIHTCs.

90.

At one or more of these meetings, Buell ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████

████████████

91.

These proposed actions, each of which was ███████████████████

███████████ despite Fuerst's admonishments, ████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

 that are central to AHA's mission.[14]

92.

Moreover, those actions at Buell's direction were contrary to the terms of the public-private partnerships entered into between AHA and Integral under their development agreements, which provide for those parties to work *together* to redevelop the sites of former public housing communities with a mix of public housing, market rate housing, and community-appropriate commercial (non-housing) development, all consistent with the mandates of the grants awarded by HUD that funded and provide ongoing subsidy to a portion of affordable housing at the developments.

93.

Buell's actions were also contrary to the directive of Georgia's Housing Authorities law, which expressly "authorize[s] every authority to do any and all

---

[14] *See* footnote 3, *supra.*

things necessary or desirable to secure the financial aid or cooperation of the

federal government" in connection with the development and operation of housing

projects, including mixed-income developments. O.C.G.A. § 8-3-32.

94.

Fuerst explained ███████████████ these actions and strenuously

admonished ██████████████████████████████

████████████████████████████████████

██████████████████████████████████████

█████████████████████████████

95.

Specifically, Fuerst warned ██████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████

96.

Buell appeared to have a personal agenda contrary to AHA's mission, and

deliberately avoided seeking counsel from Fuerst of the LIHTC and affordable

housing development processes, despite Fuerst's depth of experience in these areas.

### *Buell Begins Retaliating Against Fuerst*

97.

Under Joy Fitzgerald, Buell's predecessor as President and CEO, Fuerst had been a trusted and routinely involved counselor on all real-estate related matters as well as most policy matters; she was recognized as the lead real estate attorney at AHA, and her advice was sought widely by all business leads. Beginning soon after the late 2016 AHA Investment Committee meetings when Fuerst warned of

███████████████████████████████████████████████████

█████████████████████████████████ Buell took actions to shut Fuerst out of AHA's negotiations with Integral as well as other matters.

98.

The process began quietly; initially, Fuerst noticed that she was no longer invited to senior leadership team[15] meetings, then she found that AHA's website had changed; she was no longer listed as a senior leadership team member. Later

---

[15] AHA's Senior Leadership Team at the time was a small group consisting of approximately 10 people who were identified on AHA's website. From time to time, its meetings were expanded to the Extended Senior Leadership Team, which consisted of approximately 20 people.

(either in Investment Committee meetings or when business leads sought her out and asked why she was not working on a matter), Fuerst learned about real estate projects or issues that were being worked on without her legal counsel or knowledge, even though, as Deputy General Counsel for Real Estate, Fuerst was responsible for delivery and oversight of all real estate legal services. In some instances, no real estate counsel was being provided by AHA's Office of General Counsel, and if outside counsel was providing such support, it was without Fuerst's knowledge.

99.

Buell walled off Fuerst from ongoing real estate related work being carried out by other AHA attorneys under the direction of Buell and Paul Vranicar (AHA's then General Counsel and Fuerst's supervisor) concerning AHA's agreements with Integral.[16]

100.

Buell walled off Fuerst from important communications about the funding and progress of ongoing work on affordable housing projects by Integral affiliates and other, existing AHA-procured development partners (which projects had

---

[16] *See* footnote 9, *supra*.

previously been approved by AHA's Board of Commissioners) under their respective development agreements with AHA.

101.

Buell walled off Fuerst from communications with HUD regarding the status of AHA's performance under the Choice Neighborhoods Grant, which was notable, given that Fuerst had a productive working relationship with and had been serving as AHA's lead legal liaison with HUD at its highest levels under Joy Fitzgerald, AHA's prior President and CEO.

102.

At times, Fuerst was unable to obtain support from legal staff supervised by her to assist with Fuerst's work on pressing real estate matters involving parties other than Integral; instead, Fuerst was informed by her direct reports that "I'm working on something for Catherine [Buell] now and I've been told it takes precedence."

103.

Some of the third-party communications that Buell concealed from Fuerst included warnings from DCA about the potential loss of LIHTC funding due to AHA's failure to timely approve financial closings necessary for Integral and its affiliates to continue developing and rehabilitating affordable housing for AHA.

Fuerst learned of this communication from a concerned subordinate who showed it to her in an email she had received.

### *Fuerst Makes Further Protests and Disclosures During a December Conversation with Buell*

104.

In December 2016, Fuerst had a discussion with Buell in the presence of Fuerst's supervisor, General Counsel Paul Vranicar.  In that meeting, Fuerst discussed with Buell that (i) Fuerst was aware that AHA had engaged a recruiting firm which had (without referencing AHA) posted a job search for a managing-level real estate attorney position, and (ii) Fuerst had become aware of several pending real estate related legal matters that normally would be handled or directed by Fuerst, but were ongoing without Fuerst's direct knowledge or involvement. Fuerst expressed her devotion to AHA's mission and love for the organization, but given the recent course of events, sensing that Buell did not want to work with Fuerst for some unexpressed reason, Fuerst offered to leave AHA voluntarily. Buell, claiming that the projected hire was because AHA would be very busy with more real estate transactions, assured Fuerst that she wanted her to remain.

105.

At that same meeting, Fuerst told Buell ███████████████████████

███████████████████████████████████████████████



106.

At this meeting, Fuerst offered to help inform ███████████████████

*Fuerst Engages in Further Protected Activity at a February 2017 Investment Committee Meeting by Challenging Buell's Actions Concerning the Approval of a Financial Closing Mandated Under the Choice Neighborhoods Grant Agreement*

107.

In addition to the risk of violating LIHTC requirements and risking the loss of tax credit equity, some of the ongoing, serially delayed approvals by AHA of Integral closings risked triggering AHA's default under a $30 million grant

agreement among AHA as grantee, the City of Atlanta as co-applicant, and HUD

as grantor. HUD awarded the grant in 2015 to cover part of the costs for the

continued revitalization of AHA's former University Homes public housing

community and the surrounding Atlanta neighborhoods (the "**Choice**

**Neighborhoods Grant**").

108.

On or about February 16, 2017, Fuerst strenuously protested ██████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

109.

Fuerst, hearing for the first time at the meeting what ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

110.

Fuerst explained that ████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

111.

Fuerst responded to Buell that ██████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████



112.

Fuerst reminded everyone in the Investment Committee meeting that

113.

Fuerst continued, strongly admonishing that

---

[17] Section 10(a) of the University Homes Revitalization Agreement includes the following mandate: "The Developer will consult with AHA or its designated representative with respect to the development of the legal and financial transaction structures or arrangements to support the University Revitalization Plan. The Developer will adopt only those structures to which AHA has given its prior consent, *which shall not be unreasonably withheld*." (emphasis added).

 in its mission of "provid[ing]

quality, affordable housing in amenity rich, mixed-income communities for the

betterment of the community." AHA Bylaws, Section 1.2.

114.

The Choice Neighborhoods Grant Agreement mandated that the financing

for the first development project funded with the grant be closed on or around

March 28, 2017. It was clear over the course of several Investment Committee

meetings that this contractual milestone would not be met, given Buell's deliberate

and arbitrary repudiation of Integral's development agreement for University

Homes and intentional, serial delays in submission to the AHA Board of the

resolutions that needed to be approved for timely achievement of the financial

closing milestone. In fact, Buell's arbitrary and unwarranted actions continued

through and after the time of Fuerst being fired, and HUD, in response, later

threatened to pull the $30 million Choice Neighborhoods Grant.[18]

### *Fuerst Engages in Further Protected Activity at a February 2017 AHA Extended Senior Leadership Team Meeting by Protesting AHA's Blatant Mischaracterization of the Terms of the 2011 Revitalization Agreement Amendments and AHA's Announcement of an Upcoming Newspaper Article Based on Same*

115.

On or about the week of February 20, 2017, around twenty of AHA's

leaders, including Fuerst, Buell, Proctor, the HR Director, Trish O'Connell, and

Cecilia Taylor attended an extended senior leadership team meeting run by Buell.

116.

At that meeting, Buell took up the issue of the 2011 amendments to AHA's

development agreements with Integral.

117.

Fuerst had been the lead AHA attorney involved in the negotiation and

drafting of the 2011 amendments.

---

[18] *See* footnotes 7 and 8, *supra*.

118.

When the 2011 amendments were completed, the HUD-mandated, mixed-income housing phases of the HUD-approved revitalization plans for the former AHA housing communities covered by the development agreements had been developed, the HUD revitalization grants funding a portion of those developments had been fully expended towards achievement of that milestone, and the HUD mandated "replacement" public housing units were completed and occupied by low-income residents.

119.

In short, all public funds allocated towards the revitalization of the former public housing communities—mostly HUD funding granted to AHA—had been spent on prior phases of the revitalization, and the remaining phases as contemplated by the HUD-approved revitalization plans for the communities would be funded with private funds, "leveraged in" to the development by the developer. That ability to leverage was made possible by the successful, mixed-income, mixed-finance phases of the revitalization that had been developed to date under the revitalization agreements. The "further leverage" amendments set forth the terms on which both Integral and AHA, as partners in the public-private

partnership, would share in the profits from the further leverage development phases.

120.

With the input and approval of AHA's then Director of Real Estate, Joy Fitzgerald, the 2011 amendments addressed the remaining market rate components of the revitalization plans for the communities, with provisions modeled on those included in the University Homes revitalization agreement, with which Fitzgerald had also been involved.

121.

Under the 2011 amendments, consistent with the terms of the HUD grant agreements and the HUD-approved revitalization plans, private funds sourced by Integral would finance the "further leverage," market rate development components, and Fuerst negotiated for AHA to participate in a favorable share of the profits from such prospective development. In fact, under the 2011 amendments, AHA ended up in a substantially better economic position than it had been in when negotiations of those terms previously led by Fitzgerald, with assistance from outside AHA counsel, had broken off.

122.

At the extended senior leadership team meeting, Buell announced that on

Friday of that week, February 24, 2017, the Atlanta Journal Constitution would be

running an article about Integral's development agreements with AHA.[19]

123.

Taylor, who was hired by Buell to handle media outreach and other public

relations matters (even though AHA already had contracted with and continued to

use an outside public relations firm), then described the 2011 amendments to the

Integral development agreements in terms that were blatantly misleading,

inflammatory, and so shocking that the HR Director gasped audibly in response.

124.

Fuerst immediately responded that ███████████████████

████████████████████████████████████████████[20] ████

---

[19] *See* footnote 11, *supra*.

[20] Fuerst had been the lead AHA attorney involved in the negotiation and drafting
of those 2011 amendments, which resulted in significantly more favorable
economic terms for AHA than were achieved in prior negotiations. The
amendments were necessary to address the precise structural and economic terms
of the remaining, "further leverage" phases of the mixed-income developments that
were contemplated, yet not fully fleshed out, under the terms of the original
revitalization agreements, entered into many years previously. When the 2011
amendments were completed, the mandated "replacement" public housing units
that had been financed in part with the HUD grants were completed and occupied

███████████████████████████████████████

█████████████████████████████

***Fuerst Requests Reasonable Accommodations under the Americans with Disabilities Act to Address the Impact of AHA's Reprisals Against Her***

125.

The retaliation directed at Fuerst by Buell and AHA had begun to cause Fuerst both physical and mental health symptoms. The stress Fuerst experienced from working long hours, particularly in November and December 2016, coupled with being walled off and at times not having adequate manpower from the legal team she managed (who had been co-opted by Buell and Vranicar) was particularly acute at AHA's offices.

126.

On or around January 9, 2017, Fuerst advised AHA's HR Director of her need for reasonable accommodations under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("**ADA**") and submitted to the HR Director a Request for Reasonable Accommodation Form. She requested a reduction of hours down to a normal full-time load of forty hours per week from the much more arduous

---

by low-income residents. The market rate (i.e., development costs not funded by HUD), further leverage phases of the developments were all that remained to be developed under the HUD-approved Revitalization Plans. *See* paragraph 78, *supra*.

schedule Fuerst was often forced to work to achieve sometimes arbitrary timetables imposed on her, and the flexibility to telecommute (except as needed for key meetings where in-person attendance was preferable), all towards the goal of reducing the stress of being subjected to Buell's and others (at Buell's direction) reprisals against her on a daily basis in the office.

127.

On or around January 18, 2017, after seeing her doctor, Fuerst resubmitted the Request for Reasonable Accommodation form to AHA with her doctor's fax number included, and wrote the doctor to authorize him to share information about her medical condition with AHA when contacted by them.

128.

When Fuerst learned that AHA had not contacted her doctor nearly two weeks later, Fuerst inquired with the HR Director about the status of the process and he finally faxed the doctor a copy of a Request for Disability Accommodation Form, asking the doctor to fill it out and return it.

129.

On or around February 24, 2017, a nurse called Fuerst to confirm that the Request for Disability Accommodation Form as completed by Fuerst's doctor had been faxed back to the HR Director.

130.

AHA received the Request for Disability Accommodation Form from
Fuerst's doctor supporting her need for reasonable accommodations under the
ADA prior to placing her on administrative leave on the afternoon of February 24,
2017. The HR Director verbally acknowledged this receipt to Fuerst when he met
with her that afternoon.

### AHA Continues to Retaliate Against Fuerst for Her Protected Activity

131.

As further retaliatory action against Fuerst, Buell, without telling Fuerst, had
AHA engage an outside legal recruiter to identify candidates for a new,
management level in-house real estate attorney for AHA. Fuerst (AHA's then
Senior Vice President and Deputy General Counsel for Real Estate) had made no
request to hire another real estate attorney; in fact, Fuerst had accomplished
significant cost savings to AHA by training existing real estate attorneys and a
paralegal to better serve AHA's real estate legal needs (thus significantly reducing
the need to engage outside legal counsel). Under Fuerst's leadership, outside legal
spend on real estate matters was cut dramatically, saving AHA hundreds of
thousands of dollars annually beginning in 2011.

132.

Although Paul Vranicar (then General Counsel and Fuerst's supervisor) was aware of this hiring initiative, he did not inform Fuerst, who learned of it after she and other attorneys at AHA discovered on-line advertisements for the position.

133.

Fuerst asked Vranicar about the ads, who said he had planned to advise Fuerst of same. Vranicar told Fuerst in response to her questions about the reason for the hire (given that Fuerst perceived no need for additional personnel, and was concerned that AHA was seeking to hire someone to replace her given the other actions that Buell had taken against her) that he did not think it was to replace Fuerst.

134.

Fuerst later sought assurances from Buell in Vranicar's presence as to whether Fuerst's job was at risk, and Buell assured Fuerst that was not the case. In that meeting, Fuerst protested that contrary to AHA policy, the new attorney position had not been posted internally by AHA; this policy had routinely been adhered to previously insofar as Fuerst was aware.

135.

Fuerst advised both Vranicar and Buell that Lisa Washington, Fuerst's

senior-most report, was well qualified for the advertised position and deserved the

promotion given her excellent work and strong development under Fuerst. Both

Buell and Vranicar rejected Fuerst's suggestion, and declined to address the fact

that the position was not posted internally.

136.

Fuerst, Vranicar, and Mark Kemp, AHA's then COO, were directed to

interview a number of real estate counsel candidates who the recruiting firm

steered to AHA. The most qualified and suitable candidate identified by those

interviews (who did not have anywhere near Washington's experience) was later

interviewed by Buell, after which Vranicar advised Fuerst that the candidate did

poorly in speaking with Buell and would not be hired.

### *Fuerst's Disclosures to Vranicar*

137.

Approximately three more times in the following months, including in late

February 2017, Fuerst protested ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████

138.

Vranicar was a member of the Investment Committee beginning in late 2016, so he was aware of Fuerst's protests regarding ████████████████ ████████████████████████████████████████

139.

In addition, Fuerst protested in person to Vranicar about ██████████ █████████████████████████████████████████████████ █████████████████████████████████████████████ █████████████

140.

A "walk on" resolution is one that is not listed on the Board's advance meeting agenda; such resolutions are infrequent. Fuerst was unaware of this resolution until she learned of it after it was approved (Fuerst typically was required to attend Board meetings under Fitzgerald as CEO, but rarely under Buell's leadership).

141.

Likewise, the resolution was presented and passed by the Board without notice to Vona Cox, an AHA Vice President and head of its contracting and procurement division. Normally, a policy affecting procurement matters would not

only have been fully vetted with and endorsed by Cox; it would also have been

presented by her, first to the Investment Committee, and after approval by that

body, to the Board.[21]

142.

The Clean Hands Policy was written in a way that would allow for

significant abuse against AHA existing contractors in its implementation and

application. Fuerst expressed concern to Vranicar about ███████████████████

and protested that ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

143.

Finally, Fuerst also spoke with Vranicar on more than one occasion about

the fact that she, alone, was being walled off by Buell and Vranicar from what was

clearly an expansive investigation into the 2011 amendments to AHA's

revitalization agreements with Integral.  Although Fuerst was AHA's lead real

estate attorney working on the amendments, Lisa Washington, another member of

AHA's Office of General Counsel, worked with Fuerst on the amendments.

Washington had also been involved in negotiations with Integral concerning the

---

[21] *See* footnote 10, *supra*.

64

further leverage amendments prior to Fuerst's being hired at AHA, so she was very familiar with the contracts and their negotiation history. Yet only Fuerst was walled off from Integral matters and the investigations into the 2011 amendments.

144.

When Fuerst asked Vranicar why she was walled off, Vranicar told Fuerst he didn't know why, adding that he had told Buell she should talk with Fuerst. Fuerst was made to feel like a criminal.

### *Fuerst's Disclosures to AHA's HR Director*

145.

On more than one occasion, Fuerst also shared her concerns in detail with AHA's HR Director.

146.

Specifically, Fuerst told the HR Director—who did not participate in the Investment Committee meetings—about the Investment Committee meeting in which █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

147.

Also, Fuerst told the HR Director about similar instances of Investment

Committee meetings in which ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

148.

Likewise, Fuerst had told the HR Director how she had been walled off from

working on matters that she routinely handled in her position as Senior Vice

President and Deputy General Counsel, and that Fuerst was only learning of some

matters by virtue of her role as a member of the Investment Committee, and not

because her legal counsel was sought.

149.

The HR Director was also well aware of the toll that this and other

retaliatory actions had taken on Fuerst, as Fuerst had been communicating with

him since early in January, seeking a reasonable accommodation under the

Americans with Disabilities Act to lessen symptoms of the stress that Fuerst was

experiencing.

150.

Further, Fuerst spoke to the HR Director of her grave concerns about ███████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████ In fact, as Fuerst told the HR Director, █████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

151.

In that same conversation with the HR Director, Fuerst told him about ███████

█████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

[redacted]

[redacted]

[redacted]

[redacted]

152.

Further, Fuerst recounted to the HR Director that after the first outside counsel (who was on the phone call with Fitzgerald and Halpern) was consulted about the Board authority for the 2011 Integral development agreement amendments, Holland & Knight (former Mayor Kasim Reed's former law firm) was engaged under the direction of then General Counsel Paul Vranicar (also formerly with Holland & Knight), at Buell's request, to look into those amendments. Now that Baker, Donelson was involved, Fuerst shared her concern with the HR Director that it appeared that Buell was seeking to hire as many law firms as it took to give her the (false) answer that she and the Board wanted about whether there was Board authority for the 2011 amendments to the Integral agreements.

***AHA Places Fuerst on Administrative Leave Pending an Investigation and
Ultimately Terminates Her on False, Retaliatory Pretenses***

153.

Chief Operating Office Mark Kemp and the HR Director came into Fuerst's
office with no warning on the afternoon of February 24, 2017, told her that "as she
knew" there was an ongoing inquiry into the Revitalization Agreement
Amendments and options on surrounding properties granted to Integral, and that it
was being recommended that she be investigated regarding those matters.

154.

Kemp and the HR Director told Fuerst that she was being placed on
administrative leave for two to four weeks, effective immediately, for purposes of
an "investigation" into her role with respect to the 2011 Integral Revitalization
Agreement amendments.

155.

AHA took away Fuerst's access to documents, email, and voicemail, but left
her with her company cell phone, solely for purposes of contact with the HR
Director. Kemp and the HR Director told Fuerst she must leave the office at the
conclusion of their meeting.

156.

Fuerst asked why she was being investigated, and Kemp responded that he could not tell her that information and would not answer any questions. Kemp told Fuerst that after the investigation, "We will see where things are; maybe you will come back, maybe you won't."

157.

Fuerst asked whether the process she was being subjected to was addressed in AHA's Employee Handbook. The HR Director said no. At this point, Kemp left the meeting, while the HR Director remained in Fuerst's office, telling Fuerst to take her time packing up her things.

158.

Fuerst printed a portion of the AHA Employee Handbook, including the Whistleblower and Non-Retaliation provision, and the HR Director said she could take those pages with her. *See* Exhibit A. She handed the HR Director a copy of the provision and read over the relevant portions of that provision with him, advising him that she was formally notifying him that she was a whistleblower. She stated that she had not disclosed any of her concerns outside of AHA yet, but reminded him of all the matters she had previously disclosed to him and to Buell in

Investment Committee and other meetings, described above, stating those prior

disclosures were protected disclosures.

159.

Despite a requirement under the whistleblower provision of AHA's

Employee Handbook as well as under the NDAA that AHA promptly investigate

reports of retaliation against whistleblowers and keep Fuerst as the reporting

individual informed as to the status of the investigation, AHA did not investigate

Fuerst's claims and refused to inform her of anything.

160.

On information and belief, AHA conducted no investigation of Fuerst of any

sort, despite Kemp and the HR Director telling her that she was put on leave for

purposes of an investigation. Fuerst's then-counsel requested from AHA a copy of

any investigatory report or documents related to the alleged investigation, but

AHA provided none.

161.

Likewise, AHA failed to respond to Fuerst's request for a reasonable

accommodation under the ADA after Fuerst had complied with all requests made

of her by AHA. Nonetheless, the HR Director acknowledged to Fuerst that he had

received the completed Request for Disability Accommodation Form from Fuerst's

doctor supporting her need for reasonable accommodations under the ADA prior to Fuerst being placed on administrative leave on the afternoon of February 24, 2017.

162.

AHA terminated Fuerst on March 9, 2017 (effective March 10, 2017), a mere nine business days after her latest protected disclosures and with full knowledge of her whistleblower status, citing a "loss of confidence in [Fuerst's] ability to provide legal counsel in matters pertaining to real estate."

163.

AHA's pretextual explanation for Fuerst's termination flies in the face of every review she received (all of which were laudatory) as well as the HR Director's follow up communication with the Georgia Department of Labor ("**GDOL**") on Fuerst's unemployment claim, when GDOL required verification that Fuerst was not terminated for cause based on that language in her termination letter. GDOL promptly moved forward with processing Fuerst's unemployment payments after hearing from the HR Director, meaning it determined she was not terminated for cause.

### *AHA Fails to Investigate Fuerst's Whistleblower Claim*

164.

When the HR Director reported Fuerst's status as a whistleblower to Buell—who was already aware of Fuerst's disclosures and protests—and the then Acting General Counsel Terri Thompson-Mallet, they told the HR Director that Fuerst was not a whistleblower and declined to carry out any investigation.

165.

AHA management never told the HR Director that Fuerst had filed a whistleblower complaint with HUD's Office of the Inspector General ("**OIG**").

166.

Later, after having left AHA's employ, the former HR Director confirmed to Fuerst that AHA never investigated her whistleblower allegations.

### *Fuerst Exhausts Her Administrative Remedies*

167.

Fuerst filed a complaint of retaliation with HUD OIG on November 8, 2017. *See* Exhibit B.

168.

On December 12, 2017, HUD OIG emailed Fuerst stating that the information she provided indicated she may be covered by the NDAA and asking for additional information.

169.

On December 14, 2017, Fuerst responded to HUD OIG with additional information about her protected disclosures and retaliation. *See* Exhibit C.

170.

On May 4, 2018, Fuerst provided HUD OIG with further additional information. *See* Exhibit D.

171.

On May 16, 2018, Fuerst received a whistleblower close-out notice from HUD OIG, informing Fuerst that it found she was not a whistleblower based on the contents of her complaint of retaliation and that it was closing the matter, thus exhausting her administrative remedies. *See* Exhibit E.

### *Fuerst's Damages*

172.

AHA's retaliation against Fuerst caused her, and continues to cause her, significant financial and reputational harm as well as emotional distress.

173.

HUD's conflict of interest rules severely limited what work Fuerst could engage in after her termination from AHA for a one (1) year period, unless AHA sought a waiver from HUD on her behalf to allow such work. *See* HUD Procurement Handbook for Public Housing Agencies, Section 4.4(B); 24 C.F.R. § 85.36(b)(3). Fuerst's then-counsel asked AHA to request such waiver, and AHA refused.

174.

Fuerst has applied for numerous other legal positions, most of which she is over-qualified for. She has been turned down for all of them.

175.

For example, Fuerst applied for a job at Verizon for which she was the only finalist. She lost out on the job after going through multiple successful interviews. When Fuerst asked the attorney at Verizon who had sought to hire her what happened to cause a requested hire to be cancelled so late in the process, he responded that he had never heard of this happening before. When pressed, the only explanation he offered was "resources." In fact, however, Fuerst was successfully pre-screened for her salary range tolerance on the very first phone call.

176.

Fuerst was also one of three finalists for the BeltLine General Counsel job and was informed in March 2019 that she would not be chosen for that role due to "fit."

177.

Fuerst went from making nearly $220,000 plus benefits shortly before her termination, plus a full match on retirement fund contributions worth about $24,000/year at AHA, to now making approximately one quarter of that as a self-employed attorney augmenting her income with contract legal assignments.[22]

178.

Because of Buell's and AHA's patently false statements to the media about the 2011 revitalization agreement amendments between AHA and Integral (and a

---

[22] Additionally, just before terminating her, AHA reduced Fuerst's salary to approximately $200,000. The HR Director confirmed to Fuerst that AHA did not take this action based on Fuerst's performance. On its face, the salary reduction was a public relations move in response to an article in the Atlanta Journal Constitution about excessive executive pay at AHA. *See* Dan Klepal, *Atlanta housing agency skirts salary cap for top execs*, AJC, Nov. 18, 2016, available at https://www.ajc.com/news/local-govt--politics/atlanta-housing-agency-skirts-salary-cap-for-top-execs/rb2Yk6N7t0tRwqmlo4KWzN/. Nonetheless, it is also yet another retaliatory action taken against Fuerst by AHA under Buell.

series of articles in the Atlanta Journal Constitution[23] and elsewhere recounting and regurgitating those falsehoods), Fuerst has experienced significant reputational harm. Anyone searching the internet and reading Fuerst's résumé contemporaneously would readily assume that the 2011 amendments were negotiated by Fuerst as part of her job duties.[24] This reputational harm has caused employers not to hire Fuerst, causing continued emotional distress as well as her current under-employment.

---

[23]*See, e.g.,* Willoughby Mariano, *Suit: Atlanta public housing land deal "seethes of illegality"*, Atlanta Journal Constitution, December 13, 2017, https://www.ajc.com/news/local-govt--politics/suit-atlanta-public-housing-land-deal-seethes-illegality/BF7seo14H6OjEeiIXXW99K/.

[24] *See, e.g*., AHA's press release and articles, web postings referenced in footnote 11, *supra*. The AHA press release, in describing a lawsuit filed by AHA in 2017 in an effort to defeat the 2011 amendments, states "The suit contends Integral made a secret deal with former AHA leadership to purchase the land that was not authorized by the AHA board and is completely inconsistent with AHA's mission to provide affordable housing for Atlanta's low-income residents." In addition to the "contention" in the AHA-filed suit (i.e., AHA's *position*) that there was no board authority for the 2011 amendments, the description of AHA's mission in the foregoing press release is patently false. In fact, AHA's mission statement is consistent with the mixed-income community mandate of HUD's grant programs for public housing authorities, and likewise, is consistent with the terms of AHA's development agreements with Integral and AHA's other development partners: AHA's mission is "to provide quality, affordable housing in *amenity rich, mixed-income communities* for the betterment of the community." AHA's Bylaws, Section 1.2 (emphasis added).

179.

AHA's retaliatory actions have also caused Fuerst significant emotional

distress, which has manifested itself in conditions including depression, anxiety,

insomnia, and exhaustion, beginning around the time AHA began retaliating

against her in late 2016 and continuing, in part, to the present. Fuerst sought

medical help for her symptoms on several occasions.

**COUNT I**
**Whistleblower Retaliation**
**NDAA Section 828, 41 U.S.C. § 4712**

180.

Fuerst incorporates by reference each paragraph above as if fully set forth

herein.

181.

Pursuant to the 2013 Defense Authorization Act ("**NDAA**"), as amended by

2016 Pub. L. 114–261

> An employee of a contractor, subcontractor, grantee, or subgrantee
> or personal services contractor may not be discharged, demoted, or
> otherwise discriminated against as a reprisal for disclosing to [certain
> persons] information that the employee reasonably believes is
> evidence of gross mismanagement of a Federal contract or grant, a
> gross waste of Federal funds, an abuse of authority relating to a
> Federal contract or grant, a substantial and specific danger to public
> health or safety, or a violation of law, rule, or regulation related to a
> Federal contract (including the competition for or negotiation of a
> contract) or grant.

41 U.S.C. § 4712(a)(1).

182.

"Abuse of authority" under the NDAA means "an arbitrary and capricious exercise of authority that is inconsistent with the mission of the executive agency concerned or the successful performance of a contract or grant of such agency." 41 U.S.C. § 4712(g)(1).

183.

Gross mismanagement of a federal contract or grant means "a management action or inaction which creates a substantial risk of significant adverse impact upon the agency's ability to accomplish its mission." *Kavanagh v. Merit Sys. Prot. Bd.*, 176 F. App'x 133, 135 (Fed. Cir. 2006).

184.

Persons to whom such disclosures can be made include, among others, a "management official or other employee of the contractor, subcontractor, or grantee who has the responsibility to investigate, discover, or address misconduct." 41 U.S.C. § 4712(a)(2). AHA is a grantee of Federal funds under various grant agreements with HUD. Accordingly, Fuerst was an employee of a grantee at the time her disclosures were made.

185.

Fuerst engaged in protected activity under the NDAA multiple times beginning in or around November/December 2016 when she protested Buell's and AHA's actions related to the revitalization agreements with Integral and AHA's failure to approve financial closings for Centennial Place and Scholars Landing (the latter closing also being required under the HUD Choice Neighborhoods Grant Agreement).

186.

Fuerst reasonably believed that the actions and inaction by COO Buell (and later, President and CEO Buell) that Fuerst protested and disclosed rose to the level of gross mismanagement because they created a substantial risk of a significant adverse impact on AHA's ability to accomplish its mission, as stated in Section 1.2 of its Bylaws, "to provide quality, affordable housing in amenity rich, mixed-income communities for the betterment of the community;" likewise, the substantial risk of AHA's loss or impairment of its ability to secure the LIHTCs needed to develop and rehabilitate affordable housing is adverse to HUD's mission to "create strong, sustainable, inclusive communities and quality affordable homes for all."[25]  Actions and inaction at Buell's direction moved forward

---

[25] HUD Website, https://www.hud.gov/about/mission.

notwithstanding Fuerst's disclosures warning Buell of the potentially devastating consequences to AHA of the loss of existing LIHTCs and impairment of future LIHTCs, resulting in years of delays in the development of AHA's mixed-income communities under its public-private development partnerships. AHA's mission essentially ground to a halt during that period, as a result of Buell's actions and inactions.

187.

Fuerst reasonably believed that the actions of Buell and AHA that Fuerst protested and disclosed rose to the level of an abuse of authority because (1) they were made in an arbitrary and capricious fashion, in conflict with existing board approvals, and in violation of and outside the bounds of any legitimate interpretation of the terms of the Integral/AHA agreements governing AHA's mixed-income communities, with knowledge of the serious consequences to AHA, and (2) they were inconsistent with AHA's successful performance under HUD grant agreements (a) requiring and providing funding for the development of affordable housing in mixed-income housing communities consistent with HUD-approved revitalization plans, including the Choice Neighborhoods Grant Agreement,[26] and/or (b) funding capital funding, replacement housing factor

---

[26] *See* footnote 7, *supra*.

funding and/or similar funding that was targeted to be spent under AHA's MTW

Agreement with HUD or otherwise for the development, financing, and/or

modernization of public housing units in mixed-income communities including

Centennial Place and/or Scholars Landing.

188.

Fuerst's protected disclosures were made to a management official and/or

other employee of AHA who had the responsibility to communicate those

disclosures and ensure the misconduct Fuerst protested was investigated,

discovered, and/or addressed.

189.

Buell, who knew about Fuerst's protected disclosures, subjected Fuerst to

numerous discriminatory personnel actions including but not limited to (i) shutting

her out of AHA's negotiations with Integral, (ii) walling her off from ongoing real-

estate work concerning AHA's development agreements with Integral, (iii) not

telling her of important, internal AHA changes in position affecting the funding

and progress of ongoing work on affordable housing projects by Integral affiliates

and other, existing AHA-procured development partners under their respective

development agreements with AHA,  (iv) not involving her in AHA's

communications with HUD regarding the status of AHA's performance under the

Choice Neighborhoods Grant, (v) without telling Fuerst, having AHA engage an outside legal recruiter to identify candidates for a new, management level, in-house real estate attorney for AHA, when Fuerst had made no request to hire another real estate attorney, and (vi) instructing Fuerst's subordinates to prioritize work for Buell such that they were not available to work for Fuerst.

190.

The individual or individuals who made the decision to terminate Fuerst knew about her protected disclosures and her status as a whistleblower.

191.

Fuerst's termination is an adverse action.

192.

Fuerst's termination was causally connected to her protected disclosures and occurred a mere two weeks after she formally claimed whistleblower status.

193.

Fuerst has suffered significant financial, reputational, and emotional harm because of AHA's retaliation and is entitled to damages including but not necessarily limited to back pay, benefits, compensatory damages, front pay in lieu of reinstatement, and attorneys' fees and costs.

194.

Fuerst is entitled to the costs and expenses, including attorneys' fees, incurred for or in connection with bringing this Complaint and pushing this matter to judgment. 41 U.S.C. §§ 4712(c)(1)(C), 4712(c)(2).

## PRAYER FOR RELIEF

WHEREFORE, Fuerst demands that judgment be entered in her favor and against Defendant granting Fuerst the following relief:

(a) Back pay, benefits, and front pay in lieu of reinstatement;

(b) Compensatory damages, including damage to reputation and emotional distress damages;

(c) Attorneys' fees, costs, and expenses incurred for or in connection with bringing this Complaint; and

(d) Such other and additional relief as this Court deems just and proper.

Respectfully submitted this 11th day of May 2020.

**KREVOLIN & HORST, LLC**

/s/ Halsey G. Knapp, Jr.
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Barclay S. Hendrix
Georgia Bar No. 917852
*Attorneys for Plaintiff*

One Atlantic Center
1201 W. Peachtree Street, NW
Suite 3250
Atlanta, Georgia 30309
(404) 888-9700
hknapp@khlawfirm.com
hendrix@khlawfirm.com