**From:** Karen Fuerst <■■■■■■■■■■■■■■■>
**Sent:** Thursday, December 14, 2017 4:43 PM
**To:** Whistleblower <Whistleblower@hudoig.gov>
**Subject:** RE: Whistleblower Complaint vs. Atlanta Housing Authority Management Employees

Dear Sir or Madam:

Attached please find my responses to your questions posed below in your email of December 12, 2017.

Kindly let me know if you have any questions about my responses or require further information.

Thank you,

Karen Fuerst

-----Original Message-----
From: Whistleblower
Sent: Dec 12, 2017 8:28 AM
To: "'■■■■■■■■■■■■■■■'"
Cc: Whistleblower
Subject: RE: Whistleblower Complaint vs. Atlanta Housing Authority Management Employees


Ms. Fuerst:

The Whistleblower Hotline has received your submission, dated November 8, 2017.  The information you provided indicates that you may be covered by a federal law (known as the NDAA Pilot Program) that protects employees of federal grantees or contractors ("Employees") who disclose misconduct in federal programs. That law provides a remedy for Employees who suffer retaliation by their employer. To obtain a remedy under this law, the employee must file a complaint with the appropriate Office of Inspector General (OIG).

HUD OIG receives and investigates retaliation complaints relating to misconduct in HUD program; and provided its findings to HUD for a determination. After reviewing your submission, we ask that you provide the following additional information:

_____    Identify the date and substance of disclosures that you made, and to whom you
         made them.
_____     Identify the date and nature of the action taken against you, and by whom.
_____     Identify any other proceeding where you are seeking a remedy for retaliation (eg.
          grievance, state lawsuit, etc.)

Please provide this information as soon as possible, so that we may commence our review.  Your information may be submitted back by email to Whistleblower@HUDOIG.gov

You may also send any questions to this email, and we will respond promptly.

Thank you, HUD OIG

_____

Further information about the NDAA Pilot Program can be found at HUD OIG's website at: https://www.hudoig.gov/fraud-prevention/whistleblower-protection/2013-national-defense-authorization-act.

**CONFIDENTIALITY NOTICE:**
This message and any attachments are intended for use only by the individual or entity to which it is addressed. The information in this email and any attachments may contain confidential, law enforcement sensitive, privileged attorney/client communications or work products, exempt from disclosure under applicable law.  Do not share, copy or forward without consulting the Department of Housing and Urban Development, Office of Inspector General, Office of Legal Counsel. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any unauthorized interception, review, use, dissemination or copying of the information in this email and its attachments is prohibited. If you have received this email in error, please immediately call the HUD-OIG OLC at (202) 708-1613, or notify the sender by return email, and delete this email from your system(s).

**From:** Whistleblower
**Sent:** Wednesday, November 8, 2017 11:15 AM
**To:**
**Cc:** Whistleblower <Whistleblower@hudoig.gov>
**Subject:** RE: Whistleblower Complaint vs. Atlanta Housing Authority Management Employees

Good morning,

This is to inform you that your communication has been received by this Office and has been forwarded to our Investigations Division for full investigation.

Should additional information be required an investigator will contact you at the contact information you provided us.  If you have any additional information concerning this matter you can direct it here whistleblower@hudoig.gov and we will see that it's forwarded on to Investigations.

Thanks, HUD OIG

**CONFIDENTIALITY NOTICE:**
This message and any attachments are intended for use only by the individual or entity to which it is addressed. The information in this email and any attachments may contain confidential, law enforcement sensitive, privileged attorney/client communications or work products, exempt from disclosure under applicable law.  Do not share, copy or forward without consulting the Department of Housing and Urban Development, Office of Inspector General, Office of Legal Counsel. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any unauthorized interception, review, use, dissemination or copying of the information in this email and its attachments is prohibited. If you have received this email in error, please immediately call the HUD-OIG OLC at (202) 708-1613, or notify the sender by return email, and delete this email from your system(s).

**From:** Karen Fuerst [mailto:                              ]
**Sent:** Wednesday, November 8, 2017 7:29 AM
**To:** Hotline, OIG <Hotline@hudoig.gov>
**Subject:** Whistleblower Complaint vs. Atlanta Housing Authority Management Employees

To Whom it May Concern:

I am the former Senior Vice President and Deputy General Counsel for Real Estate of the Housing Authority of the City of Atlanta, Georgia ("AHA"). I have been retaliated against by AHA management level employees for having disclosed alleged wrongdoing by AHA senior management, specifically AHA's CEO, Catherine

Buell.

The retaliation consisted of multiple acts, culminating in termination of my employment.

In response to information posted on your website, please be advised as follows:

**Name, email address and telephone number:** Karen W. Fuerst; ▬▬▬▬▬▬▬▬; ▬▬▬▬ (mobile)

**Specific facts that support your complaint**: I will be happy to provide more detail once I receive a response to this email.

**Name(s) of the person(s) who have retaliated against me:** Catherine Buell (President and CEO); Mark Kemp (former COO).

Once I hear back from you, I am happy to cooperate fully with you and provide such information as you may need to assist you in assessing my complaint of reprisal.

Please note that to the extent possible, I wish to remain anonymous. I am mindful of the fact that as a former attorney for AHA, I am subject to ethical obligations.

I look forward to hearing from you. Thank you.

--Karen Fuerst

CONFIDENTIAL INFORMATION FROM COMPLAINANT WHO HAS REQUESTED TO REMAIN ANONYMOUS

To: <u>Whistleblower@hudoig.gov</u>
Date: December 14, 2017

In response to your requests in your email to me of December 12, 2017, please be advised as follows:

**Dates and substance of disclosures made by me to Atlanta Housing Authority personnel, and identity of persons to whom disclosures were made:**

1. <u>February 16, 2017; Meeting of AHA's Investment Committee</u> (which, by charter, approves actions involving significant expenditures, policy matters, etc.). Members of AHA's Investment Committee ("**IC**"), including myself, Catherine Buell, Mike Proctor and others were present, as well as members of AHA's real estate business unit, including Mike Wilson and Tom Hoenstine. The IC was being asked to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. When I asked and was informed in response by Mike Wilson (one of the business leads in attendance at the meeting) that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Catherine grew irate. (Typically, prior to Ms. Buell's tenure at CEO, it was customary for the Investment Committee to be asked to approve terms that had already been negotiated and agreed to between AHA and its development partners, but under Ms. Buell, that all changed. Often (as in this case), under Ms. Buell's leadership, it was not disclosed to members of the IC that the terms submitted to the committee for its approval (and for subsequent submittal to AHA's Board) were unacceptable to AHA's contractor, or, as in this case, contrary to the terms of AHA's agreement with the contractor.)

   In anger, Ms. Buell responded that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ms. Buell raised her voice and asked me, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I responded calmly that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ms. Buell, a Georgetown law grad with approximately 10 years' law firm practice, reiterated in an agitated fashion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I responded that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Again, Ms. Buell answered in an agitated fashion, asking ▮▮▮▮▮▮▮▮▮▮▮▮▮ I answered that I

CONFIDENTIAL INFORMATION FROM COMPLAINANT WHO HAS REQUESTED TO REMAIN ANONYMOUS

██████████████████████████████████████████████ .

I then reminded everyone in the IC meeting that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. (I had informed Ms. Buell on more than one occasion, that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

- I made the above-detailed disclosures to Ms. Buell and others in attendance at the IC meeting because of my belief that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

CONFIDENTIAL INFORMATION FROM COMPLAINANT WHO HAS REQUESTED TO REMAIN ANONYMOUS

2. <u>A similar situation had arisen in Investment Committee Meetings in November and December of 2016</u> (the IC approval was sought under different iterations on more than one occasion) regarding ███████████████████████████████████. Attendees at these meetings included myself, Mike Proctor, Catherine Buell and others (which can be confirmed from the IC minutes.) *[Catherine Buell was made CEO by AHA's Board (appointed by Mayor Kasim Reed) on 10/1/2016. [Since becoming CEO, Ms. Buell had deliberately not sought my legal advice (outside of my role as an IC member, which is not merely legal in function) on any matters pertaining to existing development agreements and consistently avoided involving me-- and walled me off--in most all transactions involving Integral. She mentioned having met directly with the principals of Integral on more than one occasion, again without consulting with the legal department (I am lead real estate attorney).]*

Again, as in (1) above, the IC was being asked to ███████████████████ ████████████████████████████████████████. This was the third out of four phases of rehab, and was being funded by HUD pursuant to the terms of AHA's Centennial Subsidy Conversion Demonstration Project (a RAD-like subsidy conversion that HUD had approved at AHA's request pursuant to AHA's MTW authority, and for which AHA had already received additional HUD funding to be applied towards the rehab of all phases of Centennial Place). Unlike in item (1) above, however, in this instance, Mike Wilson was seeking approval of ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████. Ms. Buell advised that ███████████████ ████████████████████████████████████████████████████████ ████████████████████.

In the December IC meeting, I and others (including Mike Proctor) cautioned Ms. Buell about ████████████████████████████████████████████████████ ████████████████████. After that meeting, Catherine neither brought me into the loop nor kept me informed of the status of the negotiations.

Later, I learned about an email from the head of DCA's LIHTC division to AHA, expressing grave concerns over having learned that the AHA Board had not approved the Centennial III closing, and noting that there would be serious consequences to the loss of the LIHTCs, etc. (just as I had warned Ms. Buell and others could occur, to AHA's and the project's detriment). I learned of the email only after Ms. Buell sent it to Lisa Washington, one of my subordinate attorneys, who shared it with me out of concern. Further, Ms. Buell wrote when she forwarded that email to Lisa that ████████████ █████████████████. The email Ms. Buell sent to DCA was not shared with me or Ms.

3

CONFIDENTIAL INFORMATION FROM COMPLAINANT WHO HAS REQUESTED TO REMAIN ANONYMOUS

Washington; I don't believe that any AHA attorney was consulted about it. Ms. Buell had little experience in affordable housing development, and the fact that she would address a matter as serious as this with no legal counsel was alarming. Her efforts to go around my advice and hide things such as the correspondence with DCA from me were taking a toll on me; I was constantly worried about the risk and potential damage to my client, AHA.

- As in item (1) above, I made the above-detailed disclosures to Ms. Buell and others in attendance at the IC meetings because of my belief that in deliberately ignoring the terms of its existing agreements as well as prior AHA Board approvals governing the LIHTC applications for the subject transaction, AHA was ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

3. <u>I had a conversation with Ms. Buell in November or December of 2017</u> recounting my belief that ████████████████████████████████████████████████████████████████████████████████████. I believe that my supervisor, Paul Vranicar, was present at that meeting. ████████████████████████████████████████████████████████████████████████████████████████████████████. (Ms. Fitzgerald was pushed out as CEO last fall by the Board [Mayor Kasim Reed] in favor of Ms. Buell, who worked for the Mayor as a legislative aid a number of years ago when Kasim was in the legislature and Catherine was a Spelman College student.)

Ms. Buell eventually asked me to ████████████████████████████████████████████████████████████████████████████████████████, which I provided to her on February 16, 2017, shortly before I was abruptly put on administrative leave at AHA. This memo provides detailed support for everything I told Ms. Buell, and includes as attachments copies of all related email correspondence I was able to locate. Ms. Buell became irate with me for having "cc'd" both the business lead in this matter, Trish O'Connell, and my former colleague in AHA's legal department, Lisa

Washington (who worked with me on the amendments as well as the prior, abandoned negotiations of the amendments, which predated my tenure at AHA) on the memo. Both Trish and Lisa were aware of the inquiries that Ms. Buell was making into the Revitalization Agreement amendments and had been interviewed at Ms. Buell's direction by outside counsel—the third firm hired by AHA on this issue--in connection with same, so it was only logical to me to copy them on the memo. (In fact, I had a concern that if the memo was delivered only to Catherine, it would be "misplaced," or worse, altered to present information that may not be factually accurate.)

4. <u>Extended AHA Senior Leadership Team Meeting in February 2017</u> (I believe this occurred early in the week of February 20); attendees--I, together with approximately 20 of AHA's leaders, including Catherine Buell, Mike Proctor, Sean Bennett (HR), Trish O'Connell and Cecilia Taylor (AHA's Communications Director, who was hired by Ms. Buell and made a member of a rather small (6 person) Senior Leadership Team). Ms. Buell announced that beginning Monday of the following week, AHA would have a new General Counsel, who would be coming from D.C., and was the head of D.C.'s housing authority board, so she would "do a great job of training AHA's board." (I later learned quickly in doing a Google search of the new GC, Ms. Terri Thompson Mallet, that she had been cited for a pattern of the D.C. housing authority's violations of the Open Meetings Act.) My boss, Paul Vranicar, would no longer serve as an attorney for AHA. I am advised that Ms. Thompson-Mallet has only the title of "interim" GC, and I see she is not even listed on AHA's website (where it still shows Mr. Vranicar as GC). Moreover, I am advised Ms. Thompson-Mallet remains as the Board Chair of the D.C. Housing Authority.

At the meeting, Ms. Buell also announced that on Friday of that week, there would be an article in Atlanta's leading newspaper, the Atlanta Journal-Constitution ("**AJC**"), about the Revitalization Agreement Amendments with Integral. Cecilia Taylor proceeded to describe what the agreements say, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (this content was exactly what later appeared in the AJC). I immediately made statements to correct ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As I recall, Tracey Scott, AHA's then lead for MTW matters with HUD, also expressed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Myrianne Robillard, AHA's SVP for Finance, made a point of saying that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

CONFIDENTIAL INFORMATION FROM COMPLAINANT WHO HAS REQUESTED TO REMAIN ANONYMOUS

It was very clear to me that it was the intent of Ms. Buell and the Board, aided by Ms. Buell's recent hires, to pitch their story to the press try to accomplish their objectives (break the Integral contracts) in the "court of public opinion." Those of us in the meeting who knew the truth about the agreements were dumbstruck after this exchange. In any event, Ms. Buell quickly moved on to the next item on her agenda. She made absolutely no attempt to respond to or even acknowledge what Trish O'Connell, I and others had said in response. [The newspaper article did not run that Friday, but instead ran two weeks later, on the day I was officially terminated by AHA; there have been a number of articles since then, always inaccurate and inflammatory in tone. There have been several articles in other publications that are accurate.]

**Dates and nature of the action taken against me at Atlanta Housing Authority, and by whom:**

On the afternoon of Friday, February 24, 2017, Mark Kemp (COO) and Sean Bennett appeared in my office. Mr. Kemp advised me that I was being put on administrative leave for 2-4 weeks, because "it had been recommended" that there be an investigation. He would not tell me what was being investigated, or who recommended it; his only response was "I can't tell you that, for my protection as well as yours." I expressed surprise and concern, telling him it sounded bad, as if I had done something wrong. Mark Kemp got up and said Sean Bennett would walk me out. I could take my cell phone so they could call me if they had any questions. I would be cut off from all other contact with AHA (email, docs, etc.).

Before Sean Bennett walked me out, I pulled up the Whistleblower and Non-Retaliation provision of AHA's Employee Handbook. I had him read along with me through the relevant portions of the policy, and specifically, had him acknowledge that the Whistleblower provision applied to internal AHA investigations, as well as other matters. In addition, I listed anew for him the instances that I had discussed with him over the past month or so that were suspected or actual violations of AHA policy (there are others in addition to those listed here, including the push through by Catherine Buell, without going through the Investment Committee or telling the then head of procurement for AHA--who was later terminated--of a "walk-on resolution" "Clean Hands Policy," which is rife with potential for abuse in the procurement arena). I then stated to him that I was a whistleblower. Mr. Bennett took notes as I was talking. I asked if my boss (the then-General Counsel, Paul Vranicar) was aware of my being put on leave, and Sean said he didn't think so; in fact, Sean had just learned of the plans the day before. (Paul was not at work that day, so I had no opportunity to talk with him before I was escorted out.)

I checked in with Sean Bennett when I did not hear from him near the end of my first week of leave, and he had nothing to tell me other than "I reminded Catherine and Mark that we needed to get back with you." (Apparently, there was never any investigation; at least they would never confirm there had been one.) On Thursday, March 9, 2017, Sean Bennett called me to tell me that effective the next day, I was "terminated." He could not tell me why, but said there was a letter being drafted. I received it the following day.

CONFIDENTIAL INFORMATION FROM COMPLAINANT WHO HAS REQUESTED TO REMAIN ANONYMOUS

**Identify any other proceeding where you are seeking a remedy for retaliation:**

None.  I hired counsel and attempted to negotiate some severance, since in the past, AHA had typically paid severance.  I was a valued employee and was recognized for my dedication, hard work and superior legal skills. I routinely was awarded the highest ratings at my annual reviews.  After I was hired I was instrumental in effecting a cut in AHA's outside legal spend for non-litigation matters by approximately 2/3 (down to approximately $100,000).

The response my attorney received in his conversations with AHA's employment counsel was that "we used to pay severance, but we don't do that anymore."  Also, when my attorney pointed out to opposing counsel that as a policy level employee of AHA, I was precluded from doing any work, directly or indirectly, for any contractor of AHA for a period of one year following termination of employment, AHA's outside employment counsel claimed not to know what my attorney was talking about. (This rule is well known inside AHA's legal department.)  I am an affordable housing legal expert, and this restriction has effectively precluded me from practicing law in my specialty.